## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

PETE MOOMEY,                        )
                         Petitioner,   )
v.                                  )          Case No. CIV-04-880-HE
                                    )
MARTY SIRMON,                       )
                         Respondent.  )

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing *pro se*, has filed a Petition for Writ of Habeas

Corpus pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, it is recommended

that the Petition be denied.

I.       **Relevant Case History**

Petitioner was convicted after jury trial in the District Court of Oklahoma County,

State of Oklahoma, Case No. CF-98-3231, of First Degree Murder in violation of Okla. Stat.

tit. 21, § 701.7.  Petitioner was sentenced to life imprisonment without the possibility of

parole.

Petitioner appealed his conviction to the Oklahoma Court of Criminal Appeals

(OCCA).  *See* State Court Record ("Record") [Doc. #15], Exhibit 6, Brief of Appellant.  The

OCCA affirmed Petitioner's conviction by Opinion filed November 20, 2002.  *See id.*,

Exhibit 1, OCCA Opinion (hereinafter "OCCA Opinion").

Petitioner then filed an application for post-conviction relief.  The district court denied

his application, and the OCCA affirmed the denial of post-conviction relief on July 1, 2004.

*See id.*, Exhibit 2, Order Denying Application for Post-Conviction Relief and Exhibit 4, OCCA Order Affirming Denial of Post-Conviction Relief.

In this habeas action, Petitioner raises the following eleven grounds for relief:[1]

(1)     the evidence was insufficient to support the conviction for first degree murder resulting in a violation of Petitioner's due process rights;

(2)     the prosecution improperly introduced evidence of other crimes resulting in a violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights;

(3)     trial counsel rendered ineffective assistance by (1) failing to object to the introduction of other crimes evidence; (2) failing to object to the prosecutor's impermissible vouching of the State's witnesses; (3) failing to object to the prosecutor's disparaging remarks about defense counsel during closing argument; (4) failing to object to the introduction of unduly prejudicial photographs; and (5) failing to investigate/interview potential defense witnesses;

---

[1]In the section of the form petition requesting Petitioner to set forth his grounds for relief, Petitioner states: "see attached brief." Petitioner has attached to his Petition a number of pleadings, either in their entirety or excerpted. Among these pleadings is Petitioner's direct appeal brief. The Court presumes that this is the brief to which Petitioner refers. Respondent has similarly construed the Petition to raise the same claims as those raised in his direct appeal brief. In addition, Petitioner filed a pleading entitled "Motion to Vacate and Brief Pursuant to 28 U.S.C. § 2254 [Doc. #9]. He asserts additional claims of ineffective assistance of trial and appellate counsel. Respondent has addressed the merits of these claims, and they have been considered by this Court as additional claims for federal habeas corpus relief.

(4)     prosecutorial misconduct during closing argument denied Petitioner his right
to a fair trial in violation of his Sixth, Eighth and Fourteenth Amendment
rights;

(5)     cumulative error resulting from prosecutorial misconduct denied Petitioner of
his due process right to a fair trial;

(6)     the introduction into evidence of unduly prejudicial photographs denied
Petitioner his due process right to a fair trial;

(7)     Petitioner's confrontation results were violated when the trial court sustained
the State's motion *in limine* prohibiting testimony from defense witness Peeler
to establish Regina Moomey's bias;

(8)     cumulative trial error denied Petitioner his right to a fundamentally fair trial;

(9)     appellate counsel rendered ineffective assistance of counsel by failing to raise
the issue of ineffective assistance of trial counsel related to trial counsel's
alleged failure to investigate and present testimony of defense witnesses;

(10)    appellate counsel rendered ineffective assistance of counsel by failing to
develop Petitioner's claim of newly discovered evidence related to the
testimony of Kathleen Lundy; and

(11)    trial and appellate counsel rendered ineffective assistance of counsel by failing
to cause to be produced a comparison of DNA collected at the scene of the
crime.

3

Of these grounds for relief, Grounds One through Eight were raised on direct appeal. Petitioner contends the additional grounds for relief were raised in his post-conviction proceedings. As discussed *infra*, the record is not entirely clear as to whether and the extent to which these claims were raised and addressed in Petitioner's post-conviction proceedings.

## II.   <u>Standard of Review</u>

Petitioner's habeas action is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, a petitioner is not entitled to habeas corpus relief if his claim has been adjudicated on the merits by the state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1) & 2254(d)(2). In conducting this inquiry, the factual findings of the state court are presumed correct unless the petitioner rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

With regard to claims not adjudicated on the merits by the state court, the AEDPA standards do not apply. *Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). Questions of law are reviewed *de novo* and questions of fact are reviewed for clear error. *Id.*

### III.   <u>Analysis</u>

#### A.   <u>Ground One -- Sufficiency of the Evidence</u>

The victim in this case, Billy Walker, was found dead in his car, parked at the Kerr Village Apartments in South Oklahoma City, on May 23, 1998. Tr. Vol. 8 at 12-23. He died from two gunshot wounds to the head. Tr. Vol. 7 at 9. Residents of the Kerr Village Apartments testified that Walker's car had been parked there for three days. Tr. Vol. 6 at 71-89, 103-104, 106-115.

Petitioner testified at trial and admitted that he was with Walker on the evening of May 21, 1998, and had ridden with Walker, in Walker's car, to the Kerr Village Apartments. Tr. Vol. 13 at 45-51. The medical examiner testified that the evidence was consistent with Walker having been shot on this same evening. Tr. Vol. 7 at 27.

The prosecution identified a business debt Petitioner owed to Walker of approximately $160,000 as the motive for the murder. Tr. Vol. 6 at 10-15, Tr. Vol. 9(B) at 6-21, 23-25. No direct evidence linked Petitioner to the murder. However, the following circumstantial evidence linked Petitioner to the scene of the crime on the evening of May 21, 1998.

State's witness, Steve Tabor, testified that Petitioner called and asked him to pick him up from the Kerr Village Apartments at approximately 10:40 p.m. on May 21, 1998. Tr. Vol. 5 at 151-152, 175-176. When Tabor arrived, Petitioner placed a box in the back of Tabor's truck and then got in the cab. Tr. Vol. 5 at 152-153. Petitioner then wiped his hands and forearms with a page of Tabor's statement pad and tossed it out the window as they drove along. Tr. Vol. 5 at 153-154. To Tabor, Petitioner appeared to be stressed out. Tr. Vol. 5

5

at 154.   Petitioner then made certain incriminating statements to Tabor including the following: "he's not a bad person, it's just business, and watch the TV."  Tr. Vol. 5 at 153, 154-155.  He told Tabor "it has to do with $160,000."  Tr. Vol. 5 at 155.  He also told Tabor that there might be blood and glass in the truck and that Tabor should vacuum it out.  Tr. Vol. 5 at 155.  Tabor dropped Petitioner off in a church parking lot near his house, and Petitioner retrieved the box from the truck and walked away.  Tr. Vol. 5 at 154-156.

Regina Moomey, Petitioner's wife, testified that Petitioner came home on the evening of May 21, 1998, at approximately 11:30 p.m.  *See* Record, Exhibit 5, Preliminary Hearing Transcript (PH Tr.) at 37.[2]  He was carrying a box and inside the box was her .38 caliber handgun.   PH Tr. at 39.  Ms. Moomey testified that she removed a piece of glass from Petitioner's left leg and washed the glass down the sink.  PH Tr. at 41.  She further testified that she gave Petitioner a trash bag for the shorts he had been wearing.  PH Tr. at 41-42.  According to Ms. Moomey, Petitioner placed his shorts in the trash bag, changed clothes and told her he was leaving for the weekend.  *Id*.   He took the box, the trash bag with the shorts and some clothes and left.  PH Tr. at 45.   Ms. Moomey also testified that ammunition for the .38 caliber gun was located in Petitioner's night stand.  PH Tr. at 48.   Bullets used in the killing were of a type similar to bullets found at Petitioner's home.[3]   Ms. Moomey also

---

[2]Regina Moomey testified at Petitioner's preliminary hearing.  *See* PH Tr. at 36-56.  The record reflects that prior to trial, she died of natural causes.  Tr. Vol. 7 at 5.  Her preliminary hearing testimony was read to the jury at the trial.  *Id*. at 5-6.

[3]Three witnesses testified about the similarities between the bullets used in the killing and the bullets found in Petitioner's home.  *See* testimony of Calvin Burch, Tr. Vol. 7 at 159-200, Sgt. (continued...)

testified that Petitioner owed Walker money though she did not know the amount owed.  PH Tr. at 46-47.

Petitioner admitted that he left home and went to Crystal Cordes, his girlfriend's house.  Tr. Vol. 13 at 66-67.  Another friend was there and the three of them left in the middle of the night, heading to Kingston, Oklahoma, and then to Galveston, Texas.  Tr. Vol. 13 at 67-68.

Relying on the fact that no direct evidence tied him to the murder, Petitioner contends the evidence fails to show that he was present at the time the crime occurred and that he was the person who actually murdered Mr. Walker. Petitioner also contends the only circumstantial evidence consisted of Tabor's testimony and the testimony regarding the money Petitioner owed to Walker.  According to Petitioner, Tabor had a motive to lie because he was having an affair with Petitioner's wife, Regina Moomey.  Petitioner further contends that evidence pointed to an unidentified black female prostitute as the perpetrator.

Controlling United States Supreme Court precedent provides that when reviewing the sufficiency of the evidence in a habeas corpus action "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

---

[3](...continued)
Karim, Tr. Vol. 7 at 41-125, and Kathleen Lundy, Tr. Vol. 7 at 125-158.  In a separate ground for relief, Petitioner challenges the reliability of the testimony of one of these witnesses, Kathleen Lundy, an FBI forensic examiner who testified as an expert witness on behalf of the State. Petitioner's separate challenge to her testimony is not based upon a challenge to the sufficiency of the evidence.  Rather, he contends newly discovered evidence -- that Ms. Lundy gave perjured testimony in a Kentucky criminal proceeding -- establishes his actual innocence and that his appellate counsel was ineffective for failing to develop this claim on direct appeal.  That claim is addressed in the context of Ground Ten.  *See infra*, at pp. 31-36.

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).  Because the OCCA adjudicated this claim on the merits, review of Petitioner's claim is subject to deference as defined by the AEDPA, 28 U.S.C. § 2254(d).  The Tenth Circuit has not squarely decided whether sufficiency of the evidence claims are questions of law or fact for purposes of the AEDPA. 28 U.S.C. § 2244(d)(1)-(2).  If sufficiency of the evidence is treated as a legal claim under § 2254(d)(1), the court must evaluate whether the OCCA unreasonably applied the standard from *Jackson*.  If sufficiency of the evidence is treated as a factual finding then the claim falls under § 2254(d)(2), requiring the court to analyze whether the OCCA's decision was an unreasonable determination of the facts.  *See Webber v. Scott*, 390 F.3d 1169, 1178 (10th Cir. 2004).  In accord with Tenth Circuit precedent, it is not necessary to decide which standard applies here because Petitioner's claim fails under either standard. *Id.* (*citing Dockins v. Hines*, 374 F.3d 935, 939 (10th Cir. 2004)).

Under Oklahoma law, "[a] person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being.  Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."  Okla. Stat. tit. 21, § 701.7(A). Oklahoma law allows for proof of first degree murder by circumstantial evidence.  *See, e.g., Hooks v. State*, 19 P.3d 294 (Okla. Crim. App. 2001) (affirming conviction on five counts of first degree murder based solely on presentation of circumstantial evidence).

The OCCA examined Petitioner's sufficiency of the evidence claim and determined that "[t]he State's evidence was more than sufficient for a reasonable jury to conclude that the only logical hypothesis was that Moomey was guilty of the First Degree Murder of Walker." *See* OCCA Opinion at 6.[4]   As the Tenth Circuit has explained, the standard applied by the OCCA is "more onerous than *Jackson*." *Romano v. Gibson*, 239 F.3d 1156, 1164 (10th Cir. 2001).  "Thus, if the evidence was sufficient to meet Oklahoma's stricter test, it would certainly also meet the *Jackson* standard." *Id.*

After a detailed recitation of the evidence, the OCCA provided this summary:

Moomey and Walker were seen together the evening of May 21st. Moomey owed Walker a substantial amount of money.  Walker's vehicle pulled into the Kerr Village Apartments at about 11:30 p.m.  The vehicle remained there until it was discovered that Walker was dead inside the vehicle. Walker had been shot with a .38 caliber firearm.  Bullets used in the killing were matched to bullets found in Moomey's house.

Tabor picked Moomey up at the Kerr Village Apartments just after Walker's vehicle arrived.  Moomey seemed stressed out and he used some paper to wipe down his hands and arms.  Moomey made incriminating remarks to Tabor.  Moomey carried a box which was known to contain a .38 caliber revolver.  Moomey left the State on an unplanned trip to Galveston, Texas that same night.

---

[4]Judge Lile, writing the opinion for the OCCA, noted his view that the Oklahoma courts should adopt a "unified test on sufficiency of the evidence" rather than following precedent which applied a different test to a conviction based upon circumstantial evidence. *See* OCCA Opinion at 5, n.2.  As Judge Lile stated: "[t]he United States Supreme Court has abandoned the idea that circumstantial evidence is somehow less reliable than direct evidence." *Id.*

Respondent points out that the OCCA subsequently discontinued use of this stricter, "reasonable hypothesis" test in cases where guilt is based solely upon circumstantial evidence and now applies a sufficiency of the evidence test that matches the federal *Jackson* standard. *See Easlick v. State*, 90 P.3d 556, 559 (Okla. Crim. App. 2004).

*See* OCCA Opinion at 5-6.  After an independent review of the evidence, viewed in the light most favorable to the prosecution, it is clear that a rational fact finder could have found the essential elements of first degree murder beyond a reasonable doubt.  The OCCA's determination regarding the sufficiency of the evidence is neither contrary to nor an unreasonable application of *Jackson*, nor is it an unreasonable determination of the facts in light of the evidence presented.  Ground One of the Petition, therefore, should be denied.

### B.   Grounds Two and Six -- Evidentiary Issues

Petitioner claims his federal constitutional rights were violated due to the admission of certain evidence which he contends rendered his trial fundamentally unfair.

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir.1999) (*citing Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *see also Willingham v. Mullin*, 296 F.3d 917, 928 (10th Cir. 2002).   Therefore, "[s]tate court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Tucker v. Makowski*, 883 F.2d 877, 881 (10th Cir. 1989) (citation and quotation omitted); *see also Mayes v. Gibson*, 210 F.3d 1284, 1293 (10th Cir. 2000) ("Habeas relief may not be granted on the basis of state court evidentiary rulings unless they rendered the trial so fundamentally unfair that a denial of constitutional rights results.") (citation omitted).  Moreover, "because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must 'tread gingerly' and

exercise 'considerable self-restraint.'"*Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002)

(quotation and citation omitted).  With these principles in mind, Petitioner's challenges to

the admission of evidence are addressed.

## 1.    Evidence of Other Crimes, Wrongs or Acts

Petitioner first challenges the admission of the testimony of Crystal Cordes,

Petitioner's girlfriend, that Petitioner had taken valium and alcohol during the Galveston trip.

A.    I was pretty well messed up too . . . .  There's just a lot of things that is kind
      of blurred in the mind when you're--
Q.    Okay.  Why is it that you were messed up?  What had you been doing?
A.    Drinking and taking Valiums.  You know, that was pretty well -- that was a
      daily thing for me back then.
Q.    Did you do that a lot?
A.    Yes.
Q.    Did you do that with the defendant?
A.    As well, yes.
Q.    So you guys would drink and take Valium together?
A.    Yes.
Q.    And you did it -- you drank and took some Valiums -- did both of you do that
      while you were on this trip?
A.    Yes.

Tr. Vol. 6 at 179-180.

Defense counsel did not object to the admission of this evidence during trial.  On

direct appeal, the OCCA determined the admission of the evidence did not constitute plain

error because the prosecutor was merely attempting to establish the relationship between

Petitioner and Crystal Cordes and also Petitioner's state of mind after the murder.  *See*

OCCA Opinion at 6.

11

Petitioner himself testified about his drinking habits and told the jury that he had lost his license due to a DUI. Tr. Vol. 13 at 39. He also testified about the significant amount of alcohol he drank on the evening of May 21, 1998. Tr. Vol. 13 at 37, 38, 42-43, 44, 63, 72. Petitioner admitted: "I had quite a few drinks, more than -- I was having shots and beers." Tr. Vol. 13 at 44. Petitioner fails to demonstrate how the admission of this evidence rendered his trial fundamentally unfair.

Petitioner also asserts in Ground Two that the prosecutor's questioning of him on cross-examination constitutes a due process violation. The prosecution asked whether Petitioner had told his wife on the night of the murder that he "pistol-whipped somebody down at City Glass over taking those doors and windows out." Tr. Vol. 13 at 123. Petitioner responded: "No." *Id.* Petitioner contends by this question the prosecution attempted to inflame the jury by suggesting Petitioner owned a gun, which he had already denied (*see* Tr. Vol. 13 at 69-70), and by suggesting his propensity for violent behavior.[5]

On habeas review, a federal court will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law. *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002)

---

[5]Immediately following the response, defense counsel objected to the question on grounds of hearsay. The prosecution explained to the trial court that Regina Moomey told police Petitioner had made this statement to her after returning home on the evening of May 21, 1998. The prosecution wanted to use this testimony to impeach Petitioner's prior testimony concerning the subject matter of the conversations he had with his wife that evening. The trial court sustained the objection but did not admonish the jury to disregard Petitioner's response. Tr. Vol. 13 at 128.

(*citing Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998)).  Petitioner's counsel objected to this questioning and the trial court sustained the objection.  The testimony was brief and not explored further.   This testimony did not render Petitioner's trial fundamentally unfair.

### 2.   Admission of Photographs

During the trial, the State introduced photographs depicting the gunshot wounds to the victim's head -- State's Exhibits 14, 15 and 16.  *See* Record, Exhibit 8.  Trial counsel did not object to the admission of these photographs.  On direct appeal, and in this habeas action, Petitioner contends the admission of the photographs was erroneous because the photographs were unduly prejudicial.  In his direct appeal brief, Petitioner raised only state law challenges to the admission of the photographs and did not contend the admission of the photographs violated his due process rights.

Reviewing the admission of the photographs for plain error, the OCCA found the trial court did not abuse its discretion in admitting the photographs.  *See* OCCA Opinion at 9.  The OCCA determined the photographs were not unduly gruesome or prejudicial, and confirmed the medical examiner's testimony as to the details about the victim's injuries including the exact location, size and extent of the injuries.  *Id*.

For purposes of this habeas action, the admission of the photographs is reviewed only to determine whether Petitioner's trial proceedings were rendered fundamentally unfair as a result.  *Spears v. Mullin*, 343 F.3d 1215, 1225-1226 (10th Cir. 2003)  (when reviewing habeas petitioner's challenge to admission of photographic evidence, court considers whether the admission of the evidence so infected the proceedings with unfairness as to render the

jury's verdict a denial of due process); *Smallwood v. Gibson, supra*, 191 F.3d at 1275 ("The essence of our inquiry [on federal habeas review] under the Fifth, Sixth and Eighth Amendments, as applied to the states under the Fourteenth Amendment, is whether the admission of the photographs rendered the proceedings fundamentally unfair.") (citation omitted). Petitioner's trial was not rendered fundamentally unfair by the admission of these photographs. The photographs were relevant for the reasons identified by the OCCA and, as the OCCA found, were not unduly gruesome or prejudicial. *See, e.g., Jackson v. Shanks*, 143 F.3d 1313, 1322 (10th Cir. 1998) ("Though admittedly unpleasant, the [autopsy] photographs illuminated and clarified the forensic pathologist's testimony."). In addition, no due process violation resulted from the "cumulative effect" of introducing all three photographs. Petitioner is not entitled to federal habeas relief on this ground.

### D.    Grounds Four and Five -- Prosecutorial Misconduct

Petitioner next challenges conduct of the prosecutor during closing argument. He cites nine instances in which he contends the prosecutor improperly remarked that the States' witnesses were "telling the truth." *See* Record, Exhibit 6, Brief of Appellant at 31-32, *citing* Tr. Vol. 13 at 163, 206, 207, 211, 212, 213. In the first two instances, Petitioner references the following statement made by the prosecutor during closing argument:

> This defendant underestimated the integrity of his friends. Some of those people weren't real comfortable coming in here and talking to you about what they knew. They didn't really want to say some of the things that they ended up having to tell you. But they came in here, and they told the truth.

> And this defendant underestimated what his friends would do for him. They told you the truth about the night and the days after, and they all testified consistently with each other.

Tr. Vol. 13 at 163.

In the next instance, Petitioner references the prosecutor's statements about the testimony of the accountant, Dennis Maley, who testified about the amount of money Petitioner owed Walker. The prosecutor stated:

> You have to disbelieve Dennis Maley, when he tells you the defendant owed the victim $160,000. And Dennis Maley came in here and testified. There's been nothing to show that he has any beef against this defendant. There's no reason for him to tell you, other than the truth, about when he reviewed the books. He's a good accountant, quite frankly. He'll tell you that. He was there to keep track of things. And that's what he did.

Tr. Vol. 13 at 206.

In the next instance cited by Petitioner, the prosecutor states:

> He stands up here and talks about how his client's telling the truth, his client's telling the truth, his client's telling the truth. And he talks so lightly of other people taking their oath. He talks about how John Ed McCauley -- John Ed McCauley had known this man for -- knew Bill Walker for 30 years, longer than the defendant; and that he's going to go violate his oath to protect Bill Walker's honor, so that his murderer can go free?

Tr. Vol. 13 at 207.

Petitioner next cites the prosecutor's references to the testimony of Steve Tabor. Taken in context, the prosecutor stated:

> Steve Tabor -- well, all I can tell you about Steve in terms of this is if he's lying and it's all a big frame-up on Pete, he's doing a poor job of it. Why wouldn't Steve Tabor just come in and tell you, 'The defendant told me when he got in the truck, "I killed Bill Walker"'?

15

> Why wouldn't he do -- why didn't Steve Tabor tell you that?  Because
> Steve Tabor came here to tell you the truth. . . . Think about his testimony.  He
> didn't tell you that because that's not what the defendant said.  He came here
> to tell you the truth.

Tr. Vol. 13 at 210-211.

The prosecutor followed these statements with additional references to Steve Tabor's

testimony and the fact that Tabor came to "tell the truth."  Tr. Vol. 13 at 212, 213.  He made

similar references to the testimony of Linda Tabor and Regina Moomey.  Tr. Vol. 13 at 212,

213.

The prosecutor's remarks about Tabor were responsive to the following argument

made by defense counsel:

> It's a scary, scary world we're living in -- I'm not trying to scare you; I'm not
> trying to play on sympathy -- when two people can tell a story like this and
> change your destiny forever, maybe all over an affair, maybe over greed.
> Maybe Tabor wanted his wife and his business.  I don't know.

Tr. Vol. 13 at 200.  *Compare Moore v. Gibson*, 195 F.3d 1152, 1173 (10th Cir. 1999)

(although prosecutor should not vouch for the credibility of state witnesses, habeas petitioner

did not demonstrate that statements made in response to comments of defense counsel were

prejudicial to him).

Petitioner claims the prosecutor's statements constitute improper vouching and

violated his right to a fundamentally fair trial.  As a general rule, "prosecutors should not

personally vouch for the credibility of state witnesses or place their own integrity and

credibility in issue."  *Moore v. Gibson*, 195 F.3d at 1173.  However, even where such

impermissible vouching occurs, prosecutorial misconduct gives rise to federal habeas corpus

16

relief only when such misconduct either violated a specific constitutional right or "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. at 637, 643 (10th Cir. 1974). As the Supreme Court has indicated, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Taken in proper context, the remarks as a whole did not so infect the trial as to render the proceedings fundamentally unfair. As the OCCA determined, "[i]n reading the prosecutor's argument in its entirety, it becomes clear that he was merely arguing that the witnesses had no reason to lie. He was urging the jury to consider their motives and credibility." *See* OCCA Opinion at 7. The OCCA's determination of this issue is not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to habeas relief with respect to this claim.

Petitioner further contends he is entitled to habeas relief as a result of prosecutorial misconduct based on allegedly improper and disparaging remarks made about defense counsel during closing argument:

> It doesn't make any sense, even no matter how loud you talk in the courtroom or walk back and forth real quickly and shout at you and . . .
> Again, a lot of things we're going to go through. If you think about it rather than talking at the top of your lungs -- and you have got to remember why someone is doing that -- because they don't want you to think about what they're saying.

Tr. Vol. 13 at 207-208. This isolated commentary about defense counsel did not render Petitioner's trial fundamentally unfair. The OCCA's finding that "[t]he prosecutor was

clearly telling the jury to use their own interpretation of the evidence, think very carefully about the arguments of counsel, and not be persuaded by the flamboyant presentation" (OCCA Opinion at 8) is not contrary to or an unreasonable application of clearly established federal law.

Petitioner additionally alleges that when considered in cumulative fashion the prosecutor's comments denied him a fundamentally fair trial.  Because no error has been found, Petitioner's cumulative error claim necessarily fails.  *See, e.g., Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998) (rejecting habeas petitioner's challenge to cumulative effect of alleged improper prosecutorial remarks where petitioner could not demonstrate his substantial rights were affected); *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir. 1997) (petitioner's failure to demonstrate actual error resulting from prosecutorial misconduct precluded claim that cumulative effect of prosecutorial misconduct denied him a fair trial). Habeas relief should be denied on this claim.

### E.    Ground Three -- Ineffective Assistance of Trial Counsel

In his third ground for relief, Petitioner claims he was denied his Sixth Amendment right to effective assistance of trial counsel.  Petitioner claims trial counsel failed to make proper objections during trial and failed to investigate evidence which could have been made available during trial.

The OCCA, applying the clearly established principles of *Strickland v. Washington*, 466 U.S. 668 (1984), determined that Petitioner's ineffective assistance of trial counsel

claims were without merit.  *See* OCCA Opinion at 12-14.  As discussed below, the OCCA's determination is neither contrary to nor an unreasonable application of *Strickland*.

Pursuant to *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.  To demonstrate that counsel was ineffective, a habeas petitioner must satisfy a two-part test.  First, the petitioner must show that counsel's performance was deficient, using an objective standard of reasonableness and considering the totality of circumstances at trial.  *Id*. at 687-688.  Second, the petitioner must show that counsel's deficient performance prejudiced the defense.

To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  Both deficient performance and prejudice must be established in order for the petitioner to prevail on a claim of ineffective assistance of counsel.  Therefore, both components of the inquiry need not be addressed by the court if the petitioner makes an insufficient showing on one.  *Id*. at 697.

The following instances in which Petitioner claims his counsel rendered ineffective assistance are directly related to independent claims of error Petitioner raised in Grounds Two, Four, Five and Six of the Petition: (1) failure to object to other crimes evidence; (2) failure to object to the prosecution's vouching of witnesses; (3) failing to object to the

prosecutor's disparaging remarks about defense counsel; and (4) failing to object to the introduction of unduly prejudicial photographs.  As discussed above, habeas relief should be denied as to each of these independent claims of error.  Because these claims are without merit, Petitioner is not able to establish the requisite prejudice required for an ineffective assistance of counsel claim.  The OCCA's determination that Petitioner's ineffective assistance of trial counsel claims are meritless is neither contrary to nor an unreasonable application of *Strickland*.  Therefore, habeas relief should be denied as to each of these alleged instances of ineffective assistance of trial counsel.

Petitioner further alleges trial counsel rendered ineffective assistance because he failed to investigate material, exculpatory evidence from potential defense witnesses, Donna Schatz and Patsy Thompson.  This claim of ineffective assistance of counsel is now addressed.

At trial, defense counsel informed the trial court of a strategic decision not to call certain individuals endorsed as witnesses for the defense.  Tr. Vol. 12 at 165-168.  Defense counsel explained that  Tommy Merritt allegedly made a statement indicating he killed the victim, Bill Walker.  Patsy Thompson and Donna Schatz allegedly overhead Tommy Merritt make this statement while Merritt was talking on the telephone to an unknown third party.  If Merritt were called upon to testify, it was defense counsel's belief that he would deny making the statement.  If Tommy Merritt testified and denied having admitted to killing Bill Walker, Patsy Thompson would then be called for purposes of impeaching Tommy Merritt.

Defense counsel explained on the record before the trial court that he had interviewed Patsy Thompson and found her not to be a credible witness.  Defense counsel expressly

20

stated that for strategy reasons, he had decided not to call her as a witness.  Tr. Vol.  12 at 166.   For this reason, he also decided not to have Tommy Merritt or Donna Schatz testify. *Id.*  Defense counsel admitted that he had not interviewed Ms. Schatz, finding it unnecessary to do so based upon his decision not to put Ms. Thompson on the stand.  Tr. Vol. 12 at 169.

The prosecution offered the following additional information related to the credibility of Ms. Thompson's testimony.  Ms. Thompson did not come forward with the information until four and one-half months after she claimed it occurred; Mr. Merritt was Ms. Thompson's ex-boyfriend and a police report indicated that on a prior occasion she had smashed the windshield of Tommy Merritt's vehicle; Ms. Thompson told police she was Petitioner's first love and would do anything to get him out of jail; and Ms. Thompson was married to Petitioner's brother.  Tr. Vol. 12 at 170.  In addition, the prosecution pointed to evidentiary hurdles that would be presented should Mr. Merritt choose to plead the Fifth Amendment if called upon to testify as a witness. Tr. Vol. 12 at 171.

Absolutely no evidence tied Merritt to the crime.  No one testified about Merritt's relationship, if any, to Walker, any motive Merritt might have for killing Walker or whether Merritt was even present with Walker on the evening of May 21, 1998. As the prosecution stated: "[T]here is no other evidence in this investigation that connects Mr. Merritt in any way with the homicide of Mr. Walker."  Tr. Vol. 12 at 171.

Whether to call or not to call a witness constitutes a strategic decision by counsel. *See, e.g., Hoxsie v. Kerby*, *supra*, 108 F.3d at 1246.  Counsel's strategic or tactical decisions are presumed correct.  *Strickland*, 466 U.S. at 690.  As the Tenth Circuit has explained,

strategic decisions only rise to the level of ineffective assistance of counsel if they are "completely unreasonable, not merely wrong, so that they bear no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and alteration omitted).

The trial record clearly demonstrates that counsel did not believe Thompson would make a credible witness. The record demonstrates that Petitioner had full knowledge of counsel's decision not to call Thompson as a witness. The record further reflects that counsel decided without Thompson's testimony, the testimony of Schatz would not be useful. In addition, the record reflects that testimony of Thompson and Schatz could only be used to impeach Merritt who would deny having made any admission to the murder of Walker. "[W]here it is shown that a particular decision [of trial counsel] was, *in fact*, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002). Petitioner has failed to rebut the presumption that counsel's decision was sound strategy.

Addressing this claim on direct appeal, the OCCA determined counsel's decision "was within the wide range of reasonable professional conduct based on sound trial strategy." *See* OCCA Opinion at 14. A state court unreasonably applies federal law when it "correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case." *Turrentine v. Mullin*, 390 F.3d 1181, 1189 (10th Cir. 2004). The OCCA was not unreasonable to conclude that counsel's decision was based

upon sound trial strategy pursuant to *Strickland*.  Trial counsel did not render ineffective assistance in refusing to call upon these witnesses to testify at trial.  This claim for habeas relief should be denied.

### F.      Ground Seven -- Bias of Regina Moomey

As previously noted, Regina Moomey did not testify at Petitioner's trial because she was deceased.  *See supra* footnote 2.  Her preliminary hearing testimony was read to the jury.

Defense counsel wanted to elicit testimony from an individual named Robert Peeler to demonstrate that Regina Moomey was biased against Petitioner and, therefore, that her testimony was not credible. Defense counsel wanted to question Peeler about whether Regina Moomey had made an offer requesting him to kill Petitioner.  Allegedly, at one time a tape recording existed of this request, but the tape had been lost by Moomey's previous counsel. A transcript of the tape had been made by an unidentified person associated with the office of this previous counsel.  It was expected that Peeler would deny any such offer having been made.  In such event, trial counsel would have used the transcript of the tape to impeach Peeler's testimony.  Another witness, Jake Moomey -- Petitioner's son -- allegedly would testify that he had a conversation with Peeler in which Peeler admitted to him that Regina had offered money to have Petitioner killed.  He too would have been asked to testify for purposes of impeaching Peeler.  Tr. Vol. 5 at 4-14.[6]

---

[6]Apparently another individual, James Moomey, would also have given similar testimony, but he was dead at the time of the trial.  Tr. Vol. 5 at 6.

The State filed a motion *in limine* to preclude this testimony which the trial court sustained.  *Id.*  Petitioner contends this ruling violated his Sixth Amendment confrontation rights.  At trial, Petitioner's counsel did not try to call any of the witnesses to demonstrate bias of Regina Moomey.  Therefore, on direct appeal the OCCA analyzed the trial court's evidentiary ruling for plain error.

Recognizing that exclusion of evidence of bias can violate a defendant's constitutional right to confront witnesses against him, the OCCA nonetheless rejected Petitioner's claim on direct appeal finding the evidence of Regina Moomey's alleged bias against her husband "too unreliable."  *See* OCCA Opinion at 11.  As the OCCA explained:

> The evidence contains layers of hearsay which do not come under any exception.  The only witnesses that would testify that there was a request by Regina to kill Appellant was a witness who had the information based on hearsay within hearsay.  The third hand information did not conform to any hearsay exception; therefore, the evidence was inadmissible pursuant to 12 O.S.2001, § 2402.

*Id.* at 11-12.

Petitioner does not challenge the OCCA's evidentiary rulings on due process grounds.  Rather, he contends the OCCA erroneously determined there had been no violation of his confrontation rights.[7]

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

---

[7]Respondent has not addressed Petitioner's Confrontation Clause claim, but contends the trial court's ruling was correct as a matter of Oklahoma law and that challenges to evidentiary rulings are not cognizable in a federal habeas corpus action.  *See* Response at 20-21.

him."  The confrontation right includes the right to demonstrate the bias of a witness through cross-examination.  *See, e.g., United States v. DeSoto* 950 F.2d 626, 629 (10th Cir. 1991) ("One of the most important aspects of the right of cross-examination is attacking the witness' credibility and the truth of the testimony.") (*citing Davis v. Alaska,* 415 U.S. 308, 316 (1974)).  "'The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'"  *Jones v. Gibson*, 206 F.3d 946, 956 (10th Cir. 2000) (*quoting Davis*, 415 U.S. at 316-317).

Here, however, Petitioner seeks to demonstrate bias of Regina Moomey through the hearsay testimony of Robert Peeler, a defense witness.  *Compare Johnson v. Puckett*, 176 F.3d 809, 821 (5th Cir. 1999) ("We find no authority in support of Johnson's assertion that his rights under the Confrontation Clause extend to the opportunity to impeach the state's primary witness through the testimony of a witness favorable to the defense.").  The Confrontation Clause, therefore, is not implicated.  The right to confront one's witnesses does not include the right to present hearsay evidence supporting the defense's theory of the case when that evidence does not fall within any recognized exception to the prohibition against admission of hearsay evidence.[8]

In addition, the right to confront one's witnesses is not absolute:

---

[8]This is a novel confrontation scenario.  In the usual case, the defense is challenging the prosecution's introduction of hearsay evidence as a violation of the Confrontation Clause.  The admission of such testimonial hearsay evidence does not violate a criminal defendant's Sixth Amendment rights where the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  *See Crawford v. Washington*, 541 U.S. 36, 68 (2004).

> It does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecutorial witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  The trial court excluded the testimony of Robert Peeler.  The trial court found that Regina Moomey's motives for wanting Petitioner killed were not relevant to the issues in the case.  In addition, the trial court found that such evidence would confuse the jury due to the nature of its limited admissibility.  Tr. Vol. 5 at 8-9, 14.  As the court reasoned, even if Peeler's testimony were allowed and then Jake Moomey were allowed to testify to show that Peeler made a prior inconsistent statement, the jury would have to be given a limiting instruction that the prior inconsistent statement was not substantive evidence, *i.e.*, it could not be used for purposes of determining Regina Moomey's credibility.  Rather the testimony could only go to the issue of Peeler's credibility.  Tr. Vol. 5 at 9.  The trial court, therefore, acted within a constitutionally permissible framework in refusing to allow this testimony.

Even if Petitioner's confrontation rights were implicated through the exclusion of this evidence and further assuming the exclusion of this evidence violated Petitioner's confrontation rights, he would only be entitled to habeas relief if he could establish that the exclusion of the evidence was not harmless error.  *Jones*, 206 F.3d at 957.  To analyze whether the error was harmless, the appropriate inquiry is whether, assuming the damaging potential of the excluded testimony were realized, the error "'had substantial and injurious

26

effect or influence in determining the jury's verdict.'" *Id*. at 957 (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).  Here, any error resulting from the exclusion of the testimony was harmless.  As discussed, the evidence could not be admitted as substantive evidence, but had limited admissibility as impeachment evidence.[9]  Petitioner has failed to establish entitlement to habeas relief and Ground Six of the Petition should be denied.

G.      **Ground Eight -- Cumulative Error**

Petitioner asserts the accumulation of all his trial errors entitles him to habeas relief. However, "[c]umulative-error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." *Moore v. Reynolds*, *supra*, 153 F.3d at 1113; *see also Newsted v. Gibson*, 158 F.3d 1085, 1097 (10th Cir.1998) ("A non-error and a non-prejudicial error do not cumulatively amount to prejudicial error.").  The OCCA reviewed this claim and determined that "[e]ven taken in a cumulative fashion, there is no error which would cause this Court to reverse the conviction in this case or modify Moomey's sentence."  *See* OCCA Opinion at 14.  Because Petitioner has failed to demonstrate actual, prejudicial errors, there was no cumulative error and the OCCA's determination of this issue is reasonable.

---

[9]There is no indication in the record that this evidence was not available at the time of the preliminary hearing and, therefore, that Regina Moomey's bias could not have been explored at this time.

### H.   Grounds Nine, Ten and Eleven -- Ineffective Assistance of Counsel

In Grounds Nine, Ten and Eleven, Petitioner contends he received ineffective assistance of counsel as follows: (1) appellate counsel failed to raise the issue of ineffective assistance of trial counsel related to counsel's failure to investigate/interview potential defense witnesses; (2) appellate counsel failed to develop Petitioner's claim of newly discovered evidence related to the testimony of Kathleen Lundy; and (3) trial and appellate counsel failed to  investigate and produce exculpatory DNA evidence.[10]

Respondent contends Petitioner did not raise the latter two claims in his post-conviction proceedings and, therefore, these claims are unexhausted.   Nonetheless, Respondent has addressed the merits of these claims contending that because the claims are without merit, they may be denied without requiring exhaustion.  Respondent does not raise any issue of procedural bar with respect to the ineffective assistance of appellate counsel claims.

Under Tenth Circuit precedent, where analysis of the merits of an issue is more succinct than addressing the level of deference owed, or issues of procedural bar, the court

---

[10]Petitioner further contends the OCCA erroneously applied a standard other than *Strickland* in reviewing his ineffective assistance of counsel claims and that the OCCA's approach to ineffective assistance of counsel claims was subsequently rejected by the Tenth Circuit in *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003).  Petitioner is correct that in *Cargle*, the Tenth Circuit rejected a standard that had been applied by the OCCA in certain circumstances upon review of ineffective assistance of counsel claims.  However, Petitioner fails to demonstrate that the OCCA applied an erroneous standard in reviewing his claims -- either on direct appeal or in his post-conviction proceedings.  A review of the OCCA's opinions demonstrates that the OCCA cited *Strickland* and applied the *Strickland* standard in reviewing his claims.  *See* OCCA Opinion at 12; Exhibit 4, OCCA Order Affirming Denial of Post-Conviction Relief at 3.  Therefore, any alleged error on this basis is without merit.

may proceed directly to the review of the merits of the claim to deny relief.  *Smith v. Mullin*, 379 F.3d 919, 927 (10th Cir. 2004) ("We need not determine the level of deference owed the OCCA's conclusions as to these various misconduct claims or which are barred on independent and adequate state grounds.  Where an issue may be more easily and succinctly affirmed on the merits, judicial economy counsels in favor of such a disposition.") (internal quotations and citation omitted); *Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004) ("When questions of procedural bar are problematic, however, and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits.").  The manner of presentation of claims in Petitioner's post-conviction proceedings and the state district and appellate courts' interpretation and rejection of those claims makes analysis of the procedural issues more problematic than a review of the merits of Petitioner's ineffective assistance of counsel claims.[11]  Therefore, the substantial claims, all of which can be readily disposed of, are reviewed on the merits.

---

[11]In reviewing Petitioner's post-conviction application, the state district court identified the application as having raised an ineffective assistance of trial counsel claim but failed to identify the basis for that claim.  The district court concluded the claim was barred by *res judicata*.  *See* Record, Exhibit 2, Order Denying Post-Conviction Relief at 3-4.  In appealing this order, Petitioner claimed the district court had erred in its treatment of his ineffective assistance of counsel claims, noting that he alleged ineffective assistance of both trial and appellate counsel.  Petitioner ineptly articulated the basis of his ineffective assistance claims but, under a liberal construction, arguably claimed his trial and appellate counsel were ineffective for failing to develop and put forth evidence of his actual innocence.  *See* Record, Exhibit 3, Post-Conviction  Appeal Brief, "Current Argument" at 2-3.  In affirming the denial of post-conviction relief, the OCCA reviewed the merits of Petitioner's ineffective assistance of appellate counsel claim but did not identify the basis for the claim.  The Order states only that appellate counsel was not ineffective for "failing to adequately raise issues on direct appeal."  *See* Record, Exhibit 4, OCCA Order Affirming Denial of Post-Conviction Relief at 3.  Based on the vague descriptions set forth in the state court orders, out of an abundance of caution, this Court opts for a review of the merits of the claims as permitted under Tenth Circuit authority.

### 1.     **Testimony of Schatz and Thompson**

Petitioner raised ineffective assistance of  trial and appellate counsel claims based upon the alleged prejudicial effect of defense counsel's decision not to offer at trial testimony from witnesses Schatz and Thompson.  The merits of Petitioner's ineffective assistance of trial counsel claim as related to this testimony has been addressed. *See supra* pp. 20-23. The same analysis governs Petitioner's ineffective assistance of appellate counsel claim related to this testimony.  Therefore, for the reasons previously set forth, this claim is also without merit.

### 2.     **Testimony of Kathleen Lundy**

Petitioner contends that appellate counsel failed to develop his claim that the testimony of Kathleen Lundy was tainted.  Petitioner relies on news articles indicating that Ms. Lundy was convicted of perjury in a criminal proceeding in Kentucky in which she gave the same type of ballistics testimony that she offered in his criminal trial.  *See* Petition, Attachment 4, Exhibits B, C and D (collection of news articles).  He additionally contends the scientific principles upon which her testimony was based are unreliable and, again, offers news articles as support.  *See id.*, Exhibits D and E.

The OCCA affirmed Petitioner's conviction by decision dated November 20, 2002. One of the articles Petitioner attaches as evidence of Lundy's tainted testimony is dated July 20, 2002.  *See id.*, Exhibit B.  That article references Lundy's "confessed perjury" in the Kentucky criminal proceeding.  A subsequent article dated April 29, 2003 indicates that Lundy would plead guilty to perjury.  *See id.*, Exhibit C.  The evidence of Lundy's perjured

testimony was available during the pendency of Petitioner's direct appeal and, therefore, arguably, Petitioner's appellate counsel could have raised the issue before the OCCA.[12]

The news articles referencing the potential unreliability of the scientific principles utilized by Lundy are dated April 17, 2002 and February 3, 2003. *See* Petition, Attachment 4, Exhibits D and E. Again, one of these articles was published during the pendency of Petitioner's direct appeal and, therefore, arguably appellate counsel could have raised the issue before the OCCA.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). In this case, the constitutional claim is ineffective assistance of counsel.[13]

---

[12] In his post-conviction action, Petitioner raised this claim as a claim of newly discovered evidence that established his actual innocence. The OCCA reviewed the claim in this context and determined it was procedurally barred stating:

> Petitioner's application claims that he did not raise the issue of F.B.I. analyst Kathleen Lundy's tainted testimony because Ms. Lundy was not convicted of perjury until April 2003. However, as noted by the District Court, challenges to Ms. Lundy's testimony could have been raised on direct appeal, and were not dependent upon a subsequent perjury conviction. This argument is waived.

*See* OCCA Order Affirming Denial of Post-Conviction Relief at 3. As discussed, it is not entirely clear from the post-conviction record whether Petitioner also raised the claim as an ineffective assistance of appellate counsel claim and whether the OCCA reviewed the claim as such.

[13] Petitioner was represented on direct appeal of his conviction by Bill Zuhdi. *See* Record, Exhibit 6, Brief of Appellant. Petitioner filed this habeas action *pro se*. However, Mr. Zuhdi entered an appearance on behalf of Petitioner after the Response was filed and filed a Reply on Petitioner's behalf. In the Reply, Petitioner's ineffective assistance of appellate counsel claim is not addressed. Rather, Mr. Zuhdi frames the issue as a claim of actual innocence based upon newly discovered evidence. However, as stated above, actual innocence is not a stand-alone claim and,

(continued...)

Petitioner must show both deficient performance and prejudice resulting from appellate counsel's failure to develop a claim related to Lundy's perjury in the Kentucky case and to develop any challenges to the reliability of the scientific principles upon which Lundy's testimony was based.

At the time of Petitioner's trial, Ms. Lundy was employed by the FBI laboratory in Washington D.C. as a forensic examiner specializing in the chemical analysis and comparison of bullet and shot-pellet bullet-lead analysis. Tr. Vol. 7 at 125-126. She testified on behalf of the prosecution as an expert witness. Ms. Lundy performed a comparative bullet-lead analysis, comparing ten unfired cartridges found in their box at Petitioner's residence (Exhibit 47) with the fired bullet retrieved from the head of the victim (Exhibit ME-1/46A). Tr. Vol. 7 at 127, 133. According to Lundy, four of the ten cartridges were "analytically indistinguishable" from the fired bullet retrieved from the victim. In other words, chemically, one "couldn't tell those bullets apart." Tr. Vol. 7 at 136.

Following Ms. Lundy's testimony, Calvin Burch, a retired employee of Remington Arms Company (Remington), testified that the carton containing the box of ammunition found at Petitioner's home was manufactured in 1979. Tr. Vol. 7 at 162. He further testified that this particular type of bullet was very difficult to manufacture and therefore they had been produced in a very low volume. Tr. Vol. 7 at 168, 169-170. He testified these bullets

---

[13](...continued)
therefore, the issue is analyzed in the context of Petitioner's ineffective assistance of appellate counsel claim.

were last manufactured in 1988 and that Remington would have depleted its warehouse of these bullets by approximately 1993.  Tr. Vol. 7 at 172-173.

In addition to the testimony of Lundy and Burch, Sergeant Karim of the Oklahoma City Police Department, a ballistics expert, testified that the bullet retrieved from the victim was a very uncommon bullet and that the manufacturing date was 1981.  Tr. Vol. 7 at 70-71. According to Sergeant Karim, the fired bullet was a .38-caliber metal-point bullet.  Tr. Vol. 7 at 50.  Remington was the only manufacturer of this type of bullet.  Tr. Vol. 7 at 51.  The box of bullets found at Petitioner's home also contained Remington bullets, consistent in size, weight and design as the fired bullet found in the victim.  Tr. Vol. 7 at 56-58.  Sergeant Karim further testified that in the five years he had worked in the lab, this was the first time he had actually seen this type of bullet used in an incident.  Tr. Vol. 7 at 51. On cross-examination, Sergeant Karim admitted that he could not determine whether the bullet retrieved from the victim came from one of the six shell casings found at Petitioner's home. Tr. Volume 7 at 74.

Petitioner contends that he was denied the right to cross-examine Lundy about her "propensity for lying."  Reply at 3.  However, it appears the perjured testimony in the Kentucky case occurred after the jury rendered its verdict in the instant action.  Moreover, Petitioner offers no evidence that Lundy lied in his case.  It is too speculative to conclude that Lundy's perjury in an unrelated criminal proceeding prejudiced Petitioner.[14]

---

[14]In his Reply, Petitioner cites the Tenth Circuit's decision in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), as support for his argument that Lundy's perjury is relevant and should be
(continued...)

Petitioner contends the uniqueness of the bullets could not be established without Lundy's testimony.  *See* Reply at 2.  This does not equate to a claim of actual innocence.  "Actual innocence does not mean merely that the new evidence creates a reasonable doubt of the petitioner's guilt but that 'no reasonable juror would have found the defendant guilty had that evidence been produced at trial.'"  *Sellers v. Ward*, 135 F.3d 1333, 1338-1339 (10th Cir. 1998) (*quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  As Respondent points out, other witnesses testified that the fired bullet found in the victim and the bullets found at Petitioner's house, even if not "analytically indistinguishable" were nonetheless uncommon types of bullets not widely in use.  Both were .38 caliber, 158-grain "metal point" bullets and were manufactured only by Remington until approximately 1988.  In addition the box found at Petitioner's home was a Remington .38 caliber box printed in 1979.  This testimony must also be viewed with the testimony of Regina Moomey that Petitioner carried her .38 caliber gun on the night in question.

---

[14](...continued)
considered even though it occurred after Petitioner's conviction.  According to Petitioner, "the Court reviewed [the expert's] testimony in other cases where she had misrepresented the evidence that occurred after her testimony in [the case under review]."  *See* Reply at 4.

Petitioner's reliance on *Pierce* is erroneous.  Foremost, *Pierce* involved a claim for the constitutional tort of  malicious prosecution brought pursuant to 42 U.S.C. § 1983.  The Court referenced other cases in which the expert, Joyce Gilchrist, had provided falsified or misleading evidence, for purposes of addressing the plaintiff's allegations that Gilchrist had engaged in a pattern or practice of securing convictions on the basis of falsified or misleading evidence. *Pierce*, 359 F.3d at 1283.  The Tenth Circuit's analysis of the evidence in this context is in stark contrast to what Petitioner proposes here -- that the evidence of the subsequent perjury conviction be used for the purpose of establishing his actual innocence.

It should be noted here that Lundy's perjured testimony in the Kentucky action was given at a preliminary hearing, not during the course of the criminal trial.  This Court has been unable to find any case in which a conviction has been challenged due to Lundy's testimony.

Moreover, Petitioner does not offer any counter expert testimony evidencing the unreliability of the comparative bullet-lead analysis about which Lundy testified. One of the articles he attached to the Petition relays that the type of chemical analysis conducted by Lundy has been used for thirty years or more. The article further references the fact that the FBI commissioned a study by the National Research Council to evaluate its bullet-analysis methodology. *See* Petition, Attachment 4, Exhibit D. The evidence Petitioner relies upon -- consisting solely of news articles -- is insufficient to form a basis for establishing his actual innocence. At best, this evidence would be material that trial counsel could have used in conducting a cross-examination of Lundy. The record reflects that trial counsel conducted a thorough cross-examination of Lundy. Petitioner fails to establish that appellate counsel's failure to raise this issue on direct appeal was prejudicial.

In sum, Petitioner has not established that appellate counsel rendered ineffective assistance of counsel for failing to develop a claim of actual innocence. The evidence Petitioner relies upon is insufficient to establish that no reasonable juror would have found Petitioner guilty had the evidence been produced at trial. Therefore, Petitioner has failed to demonstrate that but for appellate counsel's failure to develop these claims, the result of the proceeding would have been different.

### 3.      DNA Evidence

Petitioner contends trial and appellate counsel should have investigated and produced exculpatory DNA evidence. According to testimony at trial, police investigated DNA evidence from a cigarette butt and blood-stained tissue found in the victim's car. Tr. Vol.

5 at 103, 105, 113-114, 130.  Some of the DNA evidence on the tissue matched the victim's and therefore, Walker "could not be excluded as a potential donor to the DNA profile from the tissue." Tr. Vol. 5 at 132.  In addition, it was "extremely likely" that the donor of the blood on the blood-stained tissue was the victim, Walker.  Tr. Vol. 5 at 133.  The DNA from the cigarette butt did not match either the victim's DNA or Petitioner's DNA.  Tr. Vol. 5 at 133.  Petitioner contends it was prejudicial for counsel not to have obtained a DNA "profile" from Tommy Merritt and not to have conducted a DNA comparison of Merritt's profile to the DNA evidence.

As discussed in relation to Ground Three, Patsy Thompson and Donna Schatz, listed as defense witnesses, allegedly overheard a telephone conversation of Mr. Merritt's during which Merritt stated that he killed Mr. Walker.   This is the only evidence that would inculpate Mr. Merritt as the perpetrator of the crime.  The unreliability of this evidence was discussed in detail in the context of Ground Three.  *See supra* at pp. 20-23.  Petitioner fails to demonstrate either deficient performance or  that he was prejudiced by counsel's failure to obtain such evidence.

## RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus [Doc. #1] be denied.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation.  *See* 28 U.S.C. § 636.  Any objections must be filed with the Clerk of the District Court by July __20th__, 2005.  *See* Local Civil Rule 72.1.  Failure to make timely objection to this

Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein.  *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

**STATUS OF REFERRAL**

This Report and Recommendation disposes of all issues referred by the District Judge in this matter and terminates the referral.

DATED this   30th   day of June, 2005.

VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE